IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CELINA CRUZ,                          §
                                      §
              Plaintiff,              §
                                      §
v.                                    §              1:18-CV-397-RP
                                      §
R2SONIC, LLC,                         §
                                      §
              Defendant.              §

## ORDER

Before the Court are cross-motions for summary judgment filed by Plaintiff Celina Cruz

("Cruz"), (Dkt. 36), and Defendant R2Sonic, LLC ("R2Sonic"), (Dkt. 35). Also before the Court is

R2Sonic's motion to strike, which pertains to portions of Cruz's summary judgment evidence and

briefing. (Dkt. 40). Having considered the parties' arguments, the evidence, and the relevant law, the

Court will grant in part R2Sonic's motion to strike, deny its motion for summary judgment, and

grant in part Cruz's motion for summary judgment.

## I. BACKGROUND

This is a disability discrimination case. Cruz started at R2Sonic as a temp in February 2015.

(Cruz Dep., Dkt. 35-1, at 51:24–25). She was hired to be the small company's operations

coordinator, which involves tasks like documenting shipping documents and invoices, scheduling

and receiving shipments, order fulfillment, kitting products, inventory management, and answering

phones. (Lai Decl., Dkt. 35-2, ¶ 3). Later that year she was hired full-time, and the following April

she was promoted to Operations Coordinator II, which entailed a $4-per-hour raise but did not

change her responsibilities. (Cruz Decl., Dkt. 36-1, ¶ 3; Cruz Dep., Dkt. 35-1, at 52:9–53:1). She

remained in that position until being fired in April 2017. (Lai Decl., Dkt. 35-2, ¶ 2).

In January 2017, R2Sonic organized a voluntary trip to Yellowstone for its employees. (Cruz Decl., Dkt. 36-1, ¶ 5; Lai Decl., Dkt. 35-2, ¶ 4). Cruz went snowmobiling on that trip and crashed, injuring her head and shoulder. (Cruz Decl., Dkt. 36-1, ¶ 6). When she returned to Austin on January 23, she visited her primary physician when she returned to Austin, he diagnosed her injury as a concussion and recommended that she stay home from work for about one week. (Cruz Decl., Dkt. 36-1, ¶¶ 8–9). R2Sonic accommodated her medical absence. (Lai Decl., Dkt. 35-2, ¶ 5). Cruz's doctor approved her to return to work on February 6 but limited her to working four hours per day and lifting less than 20 pounds. (Cruz Decl., Dkt. 36-1, ¶¶ 11–12; Lai Decl., Dkt. 35-2, ¶ 5). R2Sonic likewise accommodated those restrictions. (Lai Decl., Dkt. 35-2, ¶ 5). Cruz then returned to work full-time on February 13 with restrictions against working overtime or lifting over 30 pounds. (Cruz Decl., Dkt. 36-1, ¶ 12; Cruz Dep., Dkt. 35-1, at 92:3–22; R2 Mot. Summ. J., Dkt. 35, at 5). Those two restrictions remained in place until Cruz was fired on April 20. (Lai Decl., Dkt. 35-2, ¶ 7).

The parties dispute the reason that Cruz was fired. According to R2Sonic, Cruz had been inefficient for almost as long as she had been working there. (Bonneau Decl., Dkt. 35-3, ¶¶ 6–12). R2Sonic's CFO, Yating Lai ("Lai") testified that Cruz's post-injury performance had nothing to do with her termination; she was fired "for pre-January 20th performance only." (Lai Dep., Dkt. 38-4, at 67:11–22). Cruz argues that not only is the timing suspicious but that, for a variety of other reasons as well, R2Sonic's stated reason is unworthy of credence. (Cruz Resp., Dkt. 38, at 15–16).

The parties also dispute whether Cruz was given all of the accommodations she requested after Cruz returned to work full-time. On March 6, Cruz's doctor recommended that she be given 15-minute breaks every one to two hours. (Lai Decl., Dkt. 35-2, ¶ 6). R2Sonic accommodated that request. (*Id.*). But Cruz says that she requested various other accommodations—such as the temporary reassignment of certain tasks to other employees or help with physical tasks—that her supervisor Lori Bonneau ("Bonneau") denied. (Cruz Decl., Dkt. 36-1, ¶ 15). In fact, Cruz says in her

declaration that R2Sonic *took away* assistance that she had received before her injury, such as help from another employee answering phones. (*Id.* ¶ 17). Ultimately, Cruz believes that R2Sonic "never engaged in a process" to discuss potential accommodations, forcing her to routinely work overtime in violation of her doctor's recommendation. (*Id.* ¶¶ 18–20). R2Sonic responds that Bonneau told Cruz not to work overtime and that Cruz did so on her own accord. (Bonneau Decl., Dkt. 35-3, ¶ 17).

Cruz asserts several causes of action against R2Sonic. She alleges that the company violated the Americans With Disabilities Act, 42 U.S.C. 12101 *et seq.* ("ADA"), and the Texas Commission on Human Rights Act, Tex. Lab. Code § 21.001 *et seq.* ("TCHRA"), in three ways: first, by discriminating against her on the basis of a disability; second, by refusing to accommodate her disability; and third, by retaliating against her for seeking accommodations for her disability. (Orig. Pet., Dkt. 1-3, at 3–4). R2Sonic seeks summary judgment in its favor as to each of Cruz's claims. (R2 Mot. Summ. J., Dkt. 35, at 1–2, 7). Cruz, meanwhile, seeks only partial summary judgment—she asks the Court to grant her judgment as a matter of law on the issues of whether she was disabled and whether R2Sonic failed to make reasonable accommodations for her disability. (Cruz Mot. Summ. J., Dkt. 36, at 6–16, 20). She also asks for summary judgment on each of R2Sonic's affirmative defenses. (*Id.* at 17–20). Finally, R2Sonic filed a motion to strike portions of Cruz's declaration and her motion. (Mot. Strike, Dkt. 40).

## II. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party

might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

If the moving party does not bear the ultimate burden of proof, after it has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). When the movant bears the burden of proof, she must establish all the essential elements of her claim that warrant judgment in her favor. *See Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002). In such cases, the burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017).

Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin All. v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000). Cross-motions for summary judgment "must be

considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004).

## III. DISCUSSION

### A. R2Sonic's Motion to Strike

Cruz filed a declaration in support of her partial motion for summary judgment. (Dkt. 36-1). R2Sonic asks the Court to strike Paragraphs 4, 18, 19, 20, 21, 22, 23, and 24 from her declaration. (Mot. Strike, Dkt. 40, at 2–6).[1] According to R2Sonic, each of those paragraphs should be struck under the so-called "sham affidavit" rule because they are inherently inconsistent with deposition testimony she gave before making the declaration. (*Id.* at 4). R2Sonic also asks the Court to strike Part V of Cruz's partial motion for summary judgment because she used a table to present her arguments against R2Sonic's affirmative defenses.

#### 1. Cruz's Declaration

A party may not "defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) (citing *Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 137 n.23 (5th Cir. 1992)). Accordingly, a nonmoving party may not submit such an affidavit simply to "manufacture a genuine issue of material fact." *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000). This rule, dubbed the "sham-affidavit rule," is not so inflexibly applied that any affidavit contradicting prior deposition testimony will be automatically disregarded. *Axxiom Mfg., Inc. v. McCoy Invs., Inc.*, 846 F. Supp. 2d 732, 750 (S.D. Tex. 2012). Rather, courts should consider whether there are persuasive reasons for the change in the affiant's testimony. *Id.* (citing *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d

---

[1] R2Sonic argues that Paragraphs 4 and 22 should be struck because Cruz merely states legal conclusions. (Mot. Strike, Dkt. 40, at 2–3). Cruz does not dispute this position, and the Court therefore considers this portion of R2Sonic's motion to be unopposed. The Court will strike Paragraphs 4 and 22 from Cruz's declaration.

253, 270 (3d Cir. 2010)). Indeed, the rule is "'applied sparingly' and may be invoked only where there is 'some inherent inconsistency between an affidavit and a deposition.'" *Eure v. Sage Corp.*, 61 F. Supp. 3d 651, 658 (W.D. Tex. 2014) (quoting *Axxiom Mfg.*, 846 F. Supp. 2d at 749–50).

In Paragraphs 18 and 20, Cruz avers that R2Sonic did not accommodate her request for help so that she would not have to work overtime. (Cruz Decl., Dkt. 38-1, ¶¶ 18, 20). R2Sonic argues that these averments contradict her deposition testimony that she could not recall anyone at R2Sonic requiring her "to do anything at work that was outside of the restrictions" given by her doctor. (Cruz Dep., Dkt. 35-1, at 89:7–10). Cruz responds, and the Court agrees, that these two statements are not contradictory. The relevant deposition testimony was made in response to questions about restrictions given by her doctor in a note dated February 6, 2017, which limited her to four hours of work per day and lifting less than 20 pounds. (Cruz Dep., Dkt. 35-1, at 88:23–89:10; Resp. Mot. Strike, Dkt. 43, at 4). Her statements in Paragraphs 18 and 20, meanwhile, pertain to requests for accommodations made after returning to work full-time. (Cruz Decl., Dkt. 38-1, ¶¶ 18, 20). The Court will not strike these portions of Cruz's declaration.

In Paragraph 19, Cruz avers that R2Sonic "never engaged in a process . . . to discuss other potential accommodations" for her. (*Id.* ¶¶ 19). R2Sonic argues that this statement contradicts her deposition testimony that R2Sonic met with her on March 31, 2017, to discuss additional restrictions. (Mot. Strike, Dkt. 40, at 5 (citing Cruz Dep., Dkt. 39-1 at 108:7–109:4)). Cruz responds, and the Court agrees, that her declared statement that R2Sonic did not discuss other *accommodations* to help her comply with her work restrictions does not contradict her testimony that R2Sonic met with her to discuss the nature of the restrictions themselves. The Court will not strike this portion of Cruz's declaration.

In Paragraph 21, Cruz avers that Bonneau and Lai "demanded" that she "complete additional tasks" without being given additional time in a meeting on April 3, 2017. (Cruz Decl.,

Dkt. 38-1, ¶ 21). R2Sonic argues that this statement contradicts her deposition testimony that she did not actually do additional tasks after the April 3 meeting. (Mot. Strike, Dkt. 40, at 4 (citing "Cruz Dep. at 119:9–120:3")). However, the Court cannot evaluate the merits of R2Sonic's position because the testimony at issue does not appear in the any of the excerpts of Cruz's deposition in the record. (*See* Cruz Dep., Dkts. 35-1, 36-2, 38-2, 39-1). The Court will not strike this portion of Cruz's declaration.

In Paragraphs 23 and 24, Cruz describes her physical and cognitive impairments, such as "pain and numbness" in her shoulder, lingering limitations for "lifting and pushing," "dizziness and headaches," and more. (Cruz Decl., Dkt. 38-1, ¶¶ 23, 24). R2Sonic argues that these descriptions of her impairments are inconsistent with deposition testimony that "she did not have any physical work restrictions after April 2017, and never requested any accommodations from any of her subsequent employers." (Mot. Strike, Dkt. 40, at 6). Cruz responds, and the Court agrees, that these statements are not contradictory. First, much of Paragraphs 23 and 24 describe her symptoms before April 2017, when she still worked for R2Sonic. (Cruz Decl., Dkt. 38-1, ¶¶ 23, 24). Second, even the parts of those paragraphs about symptoms that persisted beyond her employment with R2Sonic do not inherently contradict her later testimony that she did not have work restrictions at subsequent jobs. A physical impairment does not necessarily entail a work restriction, which likewise does not necessarily entail an accommodation. Cruz argues, without rebuttal, that her subsequent jobs differed from her role at R2Sonic such that her limitations did not require accommodations there. (Resp. Mot. Strike, Dkt. 43, at 7). The Court will not strike this portion of Cruz's declaration.

Accordingly, the only portions of Cruz's declaration that the Court will strike are Paragraphs 4 and 22, which she does not oppose.

## 2. Part V of Cruz's Motion for Partial Summary Judgment

The last three and a half pages of Cruz's motion for partial summary judgment consist of a long table listing R2Sonic's eighteen affirmative defenses. (Cruz Mot. Summ. J., Dkt. 36, at 17–20). In that table, Cruz offers one-paragraph arguments for entering summary judgment against those defenses. (*Id.*). According to R2Sonic, this table—which uses a smaller font and wider margins than permitted by the Court's Local Rule CV-10(a)—is a "blatant attempt to circumvent this Court's page limitation rules." (Mot. Strike, Dkt. 40, at 6). R2Sonic argues that because Cruz squeezed a lot of text into a small-font table instead of seeking leave to exceed the Court's page limits, the Court should strike the table altogether. (*Id.* at 6–8). The Court will not do so. Having reviewed the briefs, the Court does not find that Cruz's use of a table prejudiced R2Sonic's ability to defend its affirmative defenses from summary judgment. And in any event, had R2Sonic needed more space in its response to attend to all of the arguments in Cruz's table, it could have sought leave to exceed the Court's page limitations. Striking Cruz's arguments entirely would be a disproportionate punishment for the crime of manipulating font size and margins under these circumstances.

### B. Was Cruz Disabled?

All three of Cruz's ADA claims[2] require her to prove that she was disabled. *See Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 222 (5th Cir. 2011) (citation and quotation marks omitted) ("As a threshold requirement in an ADA claim, the plaintiff must, of course, establish that he has a disability."). Because the existence of her disability must be assessed as of "the time of the adverse employment action," *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 618 (5th Cir. 2009),

---

[2] Cruz's ADA and TCHRA claims arise out of the same facts, and courts apply the same standards to disability discrimination, retaliation, and failure-to-accommodate claims brought under both statutes. *See Clark v. Charter Commc'ns, L.L.C.*, 18-11492, 2019 WL 2537395, at *2 (5th Cir. June 19, 2019) (quoting *Gober v. Frankel Family Trust*, 537 F. App'x 518, 520 (5th Cir. 2013) )("A disability discrimination claim under the Texas statute maps onto federal disability discrimination law, and courts 'appl[y] the legal standards for the ADA' to such claims."); *Eubank v. Lockhart Indep. Sch. Dist.*, 229 F. Supp. 3d 552, 560 (W.D. Tex. 2017), *aff'd*, 734 F. App'x 295 (5th Cir. 2018) (citing *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 473–74 (5th Cir. 2006)) (applying the same standards to retaliation and failure-to-accommodate claims brought under the ADA and TCHRA). The Court will therefore analyze Cruz's ADA and TCHRA together.

the relevant time frame in this case is the period after she returned to work full-time (for her failure-to-accommodate claim) and her termination (for her discrimination and retaliation claims). (*See* Cruz Mot. Summ. J., Dkt. 36, at 14 (arguing that R2Sonic failed to provide accommodations requested after she returned to work full-time)). Disability is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Cruz argues that she meets all three definitions. (Cruz. Mot. Summ. J., Dkt. 36, at 6–11). Both parties believe that they are entitled to summary judgment on this issue. (*Id.*; R2 Mot. Summ. J., Dkt. 35, at 9–11).

Cruz returned to work full-time on February 13. (Cruz Decl., Dkt. 36-1, ¶ 12; Cruz Dep., Dkt. 35-1, at 92:3–22; R2 Mot. Summ. J., Dkt. 35, at 5). She testifies in her declaration that from then until her termination on April 20, she suffered from various physical and mental impairments. (Cruz Decl., Dkt. 36-1, ¶¶ 23–24). Cruz could "hardly lift or push at all" right after her accident and could lift no more than 30 pounds at the time she was fired. (*Id.* ¶ 23). The damage to her shoulder resulted in "pain and numbness" lasting for months after the accident. (*Id.* ¶ 23; Doctor's Notes, Dkt. 35-2, at 10–16). She was diagnosed with post-concussion syndrome, which caused headaches, fatigue, dizziness, and sensitivity to light and noise. (Doctor's Note, Dkt. 35-2, at 10). If she stood up from her chair, she would often become disoriented for several minutes. (Cruz Decl., Dkt. 36-1, ¶ 24). She had trouble reading emails and concentrating, which forced her to re-read documents. (*Id.*). She would get so dizzy that all she could do was "sit down and rest." (*Id.*). She experienced vertigo, which persisted for months after she left R2Sonic. (*Id.*). She slept poorly, leaving her sluggish during the workday. (*Id.*). She had numbness in her hands. (*Id.*). According to Cruz, these impairments substantially limited her ability to lift and push, sleep, see, walk, concentrate, and think. (*Id.* ¶¶ 23–24).

R2Sonic does not dispute that Cruz was impaired; it argues that her impairments did not substantially limit a major life activity. (R2 Mot. Summ. J., Dkt. 35, at 9–10). Pointing to her work restrictions after returning full-time—no overtime and no lifting more than 30 pounds—R2Sonic argues that neither is the sort of limitation that qualifies as substantial under the ADA. (*Id.*).[3] Citing nonbinding authority, R2Sonic argues that "lifting restrictions encompassing 'anything from five to forty-five pounds' are 'insufficient to constitute impairments that substantially limit a major life activity.'" (R2 Mot. Summ. J., Dkt. 35, at 9 (quoting *Stockton v. Christus Health Se. Tex.*, 1:15-CV-333, 2017 WL 1287550, at *10 (E.D. Tex. Feb. 3, 2017))). Similarly, R2Sonic argues that "the inability to work overtime is not a substantial limitation on the ability to work under the ADA." (R2 Mot. Summ. J., Dkt. 35, at 9 (quoting *Harris v. PSP Indus., Inc.*, SA-07-CA-421-FB 8, 2009 WL 10702512, at *6 (W.D. Tex. Mar. 24, 2009)) (citing *Miller v. Sw. Bell Tel. Co.*, 2002 WL 31415083, at *5 (5th Cir. 2002))).

There are two problems with R2Sonic's position. The first is that it relies on outdated authority for determining what constitutes a substantial limitation under the ADA. The second is that it ignores other evidence of major life activities in which Cruz may have been substantially limited.

R2Sonic's position is outdated because it ultimately relies on case law applying the ADA as it was interpreted before Congress amended it in 2008 to "make it easier for people with disabilities to obtain protection" under the Act. 29 C.F.R. § 1630.1(4). The amendment did so by defining disability "broadly in favor of expansive coverage," and to shift courts' attention away from whether an individual "meets the definition of disability" and toward "whether covered entities have complied with their obligations." *Id.* In particular, the ADAAA explicitly rejected the strict

---

[3] R2Sonic does not dispute that working and lifting are major life activities. (*See* R2 Mot. Summ. J., Dkt. 35, at 9 (referring only to "substantial limitation")). In fact, the ADA's implementing regulations list both as examples of a major life activity. 29 C.F.R. § 1630.2(i).

interpretation of the term "substantially limits" that had been applied by courts to require an "inappropriately high level of limitation." ADA Amendments Act of 2008, § 2(b)(4)–(5), 122 Stat. 3553, 3558.[4]

R2Sonic's cited authority ultimately relies on strict interpretations of the term "substantially limits" that predate the ADAAA. *Stockton*, for example, bases its statement of law on a raft of pre-amendment cases that apply stricter pre-amendment standards to the issue of substantial limitation than the current law. 2017 WL 1287550, at *10 (citing *Tyler v. La-Z-Boy Corp.*, 506 F. App'x 265, 268 (5th Cir. 2013); *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1120 (5th Cir. 1998); *Ray v. Glidden Co.*, 85 F.3d 227, 229 (5th Cir. 1996); *Pedroza v. Autozone, Inc.*, 536 F. Supp. 2d 679, 693–94 (W.D. Tex. 2008); *Middleton v. Ball-Foster Glass Container Co., L.L.C.*, 139 F. Supp. 2d 782, 793 (N.D. Tex. 2001), *aff'd*, 31 F. App'x 835 (5th Cir. 2002)).[5] So does *Harris*. 2009 WL 10702512, at *6 (citing *Miller*, 2002 WL 31415083, at *5, and *Cotter v. Aiilon Servs., Inc.*, 287 F.3d 593, 598–99 (6th Cir. 2002)). As defense counsel must be aware, those cases are neither binding nor persuasive for determining whether a lifting restriction is evidence that a plaintiff is substantially limited in her ability to lift under the amended ADA.

Under the current ADA, "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis," and the term "shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for 'substantially limits' applied" previously. 29 C.F.R. § 1630.2(j)(1)(iii)-(iv). An impairment need not "prevent" or

---

[4] In 2002, the Supreme Court held that "to be substantially limited in performing manual tasks," a person must have an impairment that "prevents or severely restricts" him or her "from doing activities that are of central importance to most people's daily lives." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002), *overturned due to legislative action* (2009). In the ADAAA's Findings and Purposes, Congress explicitly addressed "the case of *Toyota Motor Manufacturing*," which it says "interpreted the term 'substantially limits' to require a greater degree of limitation than was intended by Congress." ADA Amendments Act of 2008, § 2(b)(4)–(5), 122 Stat. 3553, 3558.

[5] *Tyler* was decided after 2008 but arises out of events occurring prior to October 2008 and relies on *Sherrod* and *Ray*'s application of pre-amendment ADA standards. 506 F. App'x at 266, 268. Likewise, *Pedroza* is based on events occurring prior to 2006 and relies on *Sherrod* and *Ray*. 536 F. Supp. 2d at 683–87, 692–94.

"significantly or severely restrict" the performance of a major life activity in order to be substantially limiting. *Id.* § 1630.2(j)(1)(ii). The inquiry in post-amendment cases is whether a plaintiff's impairment substantially limits his or her ability "to perform a major life activity as compared to most people in the general population." *Id.* For example, the Fifth Circuit reversed the grant of summary judgment to an employer based in part on evidence that the plaintiff was unable to lift his arm above shoulder level and was restricted from lifting more than ten pounds. *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 588, 590–92 (5th Cir. 2016).

Applying current law, a reasonable jury could conclude that Cruz was substantially limited in her ability to lift. Bonneau acknowledged that after her accident, Cruz "couldn't lift anything." (Bonneau Dep., Dkt. 35-3, at 28:13). From February 13 onward, she was limited to lifting 30 pounds or less. (Cruz Decl., Dkt. 36-1, ¶ 12; Cruz Dep., Dkt. 35-1, at 92:3–22; R2 Mot. Summ. J., Dkt. 35, at 5). Because the ADA is construed broadly in favor of coverage, Cruz's inability to lift more than 30 pounds could be reasonably viewed as substantially limiting when compared with the general population. That said, the record does not foreclose the opposite conclusion. This fact dispute should be left to a jury to decide.

There are more fact issues regarding limitations on major life activities not addressed in R2Sonic's motion. "Major life activities" are defined by statute and regulation to include seeing, walking, sleeping, concentrating, and thinking. 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i). Cruz argues that her post-concussion symptoms substantially limited her in each of these activities. (Cruz Mot. Summ. J., Dkt. 36, at 8). Although Cruz was able to return to work, she testified without rebuttal that the vertigo, headaches, dizziness, hand numbness, and fatigue slowed her productivity by disrupting her focus, disabling her from "doing anything" at times, and requiring her to re-read things. (*Id.*; Cruz Decl., Dkt. 36-1, ¶ 24). Once again, because the ADA is construed broadly in favor of coverage, Cruz's cognitive impairments could be reasonably viewed as substantially limiting when

compared with the general population. As to these impairments, R2Sonic offers no justification for obtaining summary judgment in its favor other than an unavailing timing argument that is contradicted by the record.[6]

Nevertheless, R2Sonic succeeds in identifying fact issues that preclude summary judgment on the issue of disability in <u>Cruz's</u> favor. According to Lai, Cruz told her on March 31 that she "felt fully recovered." (Lai Decl., Dkt. 35-2, ¶ 8). She did not have work restrictions in similar jobs with subsequent employers and did not visit a physician after April 2017. (R2 Resp., Dkt. 39, at 8). A jury could infer from these facts that Cruz's cognitive limitations were minor enough that they do not meet the expansive definition created by the amended ADA. Fact issues preclude summary judgment in either direction on the issue of disability.[7]

## C. Disability Discrimination

Cruz alleges that R2Sonic discriminated against her based on her disability when it terminated her. (Orig. Pet., Dkt. 1-3, at 4). Where, as here, a plaintiff relies on circumstantial evidence to prove an ADA discrimination claim, courts apply the *McDonnell Douglas* burden-shifting framework. *Williams v. J.B. Hunt Transp., Inc.*, 826 F.3d 806, 811 (5th Cir. 2016); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, Cruz must first establish a prima facie

---

[6] R2Sonic argues that these impairments were not present at the time Cruz was fired, (R2 Reply, Dkt. 41, at 4). But nothing in Cruz's declaration limits her symptoms to the period before she returned to work full-time, and at the time she was fired, she was still "having bouts of vertigo and dizziness from staring at the computer," still needed to re-read documents more often, and still had difficulty sleeping, which caused her to be tired at work. (Cruz Decl., Dkt. 36-1, ¶ 24).

[7] Having found that Cruz has at least raised a material fact issue as to whether she was actually disabled, the Court need not decide whether she also raised a fact issue as to the ADA's "record" or "regarded as" prongs to conclude that R2Sonic is not entitled so summary judgment on the issue of disability.

As for Cruz's motion for summary judgment, R2Sonic has raised genuine fact issues as to the "record" and "regarded as" prongs. (R2 Resp., Dkt. 39, at 8–9). The records of Cruz's impairments do not any more establish that the impairments substantially limited her in one or more major life activities than did her actual impairments. *See* 29 C.F.R. § 1630.2(k) (applying the same broad definition of "substantially limits" to the "record of" prong). And to establish disability under the "regarded as" prong, Cruz must ultimately prove that she was subjected to a prohibited action *because of* an actual or perceived impairment. *Id.* § 1630.2(l)(1). R2Sonic disputes that causal relationship, arguing that it fired Cruz for reasons unrelated to her impairments. (R2Sonic Mot. Summ. J., Dkt. 35, at 13–16). As outlined elsewhere in this order, *infra* at 16–19, R2Sonic's evidence is sufficient to create a genuine issue of material fact as to whether it fired Cruz because of an actual or perceived impairment rather than her performance.

case of discrimination by showing: (a) she has a disability or was regarded as disabled; (b) she was qualified for her job; and (c) she was fired "on account of" her disability. *Id.* As discussed above, Cruz has made a prima facie showing that she was disabled when she was terminated. R2Sonic argues that it is entitled to summary judgment because she has not made a prima facie showing of the second or third elements. (R2 Mot. Summ. J., Dkt. 35, at 11–15).

### 1. Was Cruz Qualified for Her Job?

A "qualified individual" under the ADA is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To avoid summary judgment, a plaintiff must show that either (1) she could "perform the essential functions of the job in spite of her disability," or, (2) if she could not, that "a reasonable accommodation of her disability would have enabled her to perform the essential functions of the job." *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 697 (5th Cir. 2014) (cleaned up).

Applicable regulations define "essential functions" of a job as those that are the "fundamental job duties of the employment position" but not those that are "marginal." 29 C.F.R. § 1630.2(n)(1). Relevant evidence of whether a function is essential includes the employer's judgment and written job descriptions. *Id.* § 1630.2(n)(3)(i), (ii). The job description for Cruz's position includes the following tasks:

> (1) documentation, including preparing international and domestic shipping documents, commercial invoices, airway bills, destination specific documents, and export compliance documents; (2) scheduling and tracking of carrier pick-ups, shipments, and communicating shipment data; (3) receiving shipments, including signing for and opening incoming shipments, testing cables received for continuity, matching packing lists with purchase orders, and identifying discrepancies; (4) order fulfillment, including picking items from stockroom and packing, labeling, documenting, and completing shipping orders; (5) kitting goods for production, including collecting small parts from storage shelves, ensuring accurate counts for each kit list, verifying the supplier part number versus the internal part number, and identifying shortages; (6) inventory control, including cycle counting and variance

reconciliation as required or directed; and (7) answering phones and communicating with R2Sonic staff and others.

(Bonneau Decl., Dkt. 35-3, ¶ 2; Cruz Dep., Dkt. 35-1, at 53:7–54:10; Answer to Interrogatory No. 5, Dkt. 36-7, at 4). According to Lai, it is essential that these job functions be completed by "one person on a full-time schedule, with only the occasional need for overtime." (Lai Decl., Dkt. 35-2, ¶ 3). Although Cruz states that her "job was shipping," (Cruz Resp., Dkt. 38, at 13), she does not argue that any of her job functions were so marginal as to be inessential.

R2Sonic does not argue that Cruz was *unable* to perform any particular job function after her injury, either with or without an accommodation. (*See* R2 Mot. Summ. J., Dkt. 35, at 11–13). Rather, the problem is that Cruz could not do her job *quickly enough*: she could not perform all of the job functions without regularly taking overtime. (R2 Reply, Dkt. 41, at 5; *see* Bonneau Dep., Dkt. 38-3, at 13:2–5 (acknowledging that Cruz could do her work, just "not very quickly")). R2Sonic points to an email Cruz sent to management in March 2017 in which she stated that she "had never been FULLY able [to] keep up with or complete ALL of what's included in [her] job description" since she started as a temp in February 2015. (Cruz Email, Dkt. 35-2, at 18). In her deposition, Cruz clarified that she only meant that she could perform all of her responsibilities as long as she "consistently worked overtime." (Cruz Dep., Dkt. 35-1, at 111:8–24). But R2Sonic argues that her ability to do her job with overtime is irrelevant because an essential part of her job is doing everything in her job description without needing more than "occasional" overtime. (R2 Reply, Dkt. 41, at 5–6).

There is a genuine fact dispute as to whether it is truly essential that Cruz be able to perform everything in her job description without needing more than occasional overtime. Lai and Bonneau both state in their declarations that it is. (Lai Decl., Dkt. 35-2, ¶ 3; Bonneau Decl., Dkt. 35-3, ¶ 3). But their statements, which are offered without documentary support, are contradicted by other evidence in the record. Bonneau concedes that there is nothing in Cruz's job description that imposes a time requirement on the performance of her job functions. (Bonneau Dep., Dkt. 38-3, at

12:15–18). Cruz testifies that Bonneau gave her "a green light" to take overtime to finish her work "as often as necessary" before her injury. (Cruz Dep., Dkt. 35-1, at 111:25–112:1). Shana Ravnsborg ("Ravnsborg"), Bonneau's supervisor in 2016 and 2017, declares that there were "no defined productivity metrics for Cruz" and that Bonneau "did not take the time to sufficiently train Cruz," which suggests that Cruz's pace was not an urgent enough concern to warrant the effort of setting standards or training. (Ravnsborg Decl., Dkt. 38-1, ¶¶ 4, 7). Before her injury, Cruz was promoted and given a raise, suggesting that her pace and her overtime were not a serious concern. (Cruz Decl., Dkt. 36-1, ¶ 3; Cruz Dep., Dkt. 35-1, at 52:9–53:1). No customer ever complained about a late shipment because of Cruz, which Bonneau attributes to the fact that it is typically okay for shipments to arrive a day late. (*See* Bonneau Dep., Dkt. 35-3, at 9:3–25 (stating that "it's not like [our customers are] waiting for surgical equipment to arrive" and conceding that she could not think of a time where it was a problem that a package arrived a day late)). R2Sonic never put Cruz on a performance improvement plan or issued her any written discipline. (*Id.* at 22:12–15). All of this evidence is relevant to whether a job function is essential. 29 C.F.R. § 1630.2(n)(3) (including, in a nonexhausive list of relevant types of evidence, the "consequences" of not requiring performance of a function). A reasonable jury could conclude that doing her tasks in only 40 hours per week was not an essential part of Cruz's job: overtime was routinely approved, there were no metrics or training for working faster, late shipments never caused a problem with a customer, and Cruz was never formally reprimanded for needing to take overtime before her injury. There is no dispute that Cruz could do the essential tasks listed in her job description. If it was not essential that she do those tasks without taking more than "occasional" overtime, then she is qualified to do the essential functions of her position with or without reasonable accommodation. Fact issues preclude summary judgment against Cruz on this element of her ADA claims.

## 2. Was Cruz Terminated on Account of Her Disability?

As the final part of her prima facie burden, Cruz must show that she was fired "on account of" her disability. *Williams*, 826 F.3d at 811. She need not show that her disability was the sole cause of her termination; it need only be a "motivating factor." *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008). Put another way, she must show that disability discrimination "play[ed] a role" in R2Sonic's decision and had a "determinative influence on the outcome." *Id.*

R2Sonic argues that the evidence indisputably establishes that Cruz was fired solely for poor performance that stretched back before her disability. (R2 Mot. Summ. J., Dkt. 35, at 13–15). Bonneau declares that she had concerns about Cruz when she was still a temp because Cruz "was not developing at the expected pace." (Bonneau Decl., Dkt. 35-3, ¶ 2). Bonneau's concerns with Cruz's performance lingered throughout Cruz's tenure. Bonneau spoke to Cruz about her inefficiency and slow pace in the fall of 2015 and told her to track the time she was spending on her tasks. (*Id.* ¶ 6). Those records showed that Cruz was taking too long on certain tasks. (*Id.*). In particular, Cruz was too slow at documenting international shipments. (*Id.* ¶ 7). Bonneau suggested that Cruz do one shipment at a time and use clean templates and standardized weights in order to improve her pace. (*Id.*). Cruz's performance then improved for a time, and she received a raise. (*Id.* ¶ 9).

Bonneau says that Cruz's performance began to slump again by June 2016. (*Id.* ¶ 10). Cruz was inefficient at kitting goods for production and would procrastinate on cable testing. (*Id.*). She also had "constant issues" completing shipments by the pickup time, which required Bonneau to help her or resulted in late shipments. (*Id.* ¶ 11). According to Bonneau, she wanted to fire Cruz in November 2016 but decided not to do so because of the upcoming holidays. (*Id.* ¶ 12). Lai corroborates Bonneau's position that Cruz "had a history of performance issues" and failed to improve despite Bonneau's efforts to help Cruz improve. (Lai Decl., Dkt. 35-2, ¶ 9).

As discussed above, Cruz emailed Lai in March 2017 to talk about her workload because she had never been able to "fully . . . keep up" with her work. (*Id.* ¶ 8). Lai and Bonneau then met with Cruz a week later and went over her inability to work quickly enough. (*Id.* ¶ 10). Specifically, Lai was concerned that it took Cruz "up to three hours" to prepare an international shipping invoice with five fields. (*Id.*). Lai told Cruz to become more efficient at completing these forms and arranged to meet again in two weeks to review her progress. (*Id.*). When she had not shown improvement after two weeks, R2Sonic fired her. (*Id.* ¶ 13). According to R2Sonic, all of this evidence leaves no room for doubt that Cruz was fired solely because she had always been slow at her job and not because she was disabled. (R2 Mot. Summ. J., Dkt. 35, at 13–15).

But Cruz has introduced countervailing evidence that she was in fact fired on account of her disability. (Cruz Resp., Dkt. 38, at 15–17). First, there is the timing. Cruz was injured on January 20, 2017, and returned to work full-time on February 13. (Cruz Decl., Dkt. 36-1, ¶¶ 6, 12; Cruz Dep., Dkt. 35-1, at 92:3–22; R2 Mot. Summ. J., Dkt. 35, at 5). In the two months between her full-time return to work and her termination, her work restrictions remained the same. (Cruz Decl., Dkt. 36-1, ¶ 12). The Fifth Circuit allows "an inference of causation to be drawn" when an adverse employment action occurs "roughly two and a half months" after protected conduct. *See Richard v. Cingular Wireless LLC*, 233 F. App'x 334, 338 (5th Cir. 2007) (finding, in the context of Title VII retaliation, that a "roughly two and a half month" gap between the protected activity and termination was enough to "make out a prima facie case" for causation). Cruz's termination is near enough in time to her disability and related requests for accommodation that a temporal inference is properly drawn in this case as prima facie evidence in favor of a causal nexus.

But that is not all. On top of the timing, Cruz argues that she must have been fired on account of her disability because R2Sonic's explanation does not make sense. (*Id.* at 16). Cruz was never put on a performance improvement plan, and she was never disciplined or corrected in

writing. (Bonneau Dep., Dkt. 38-3, at 22:12–15; Lai Dep., Dkt. 38-4, at 65:12). Instead, her formal record reflects only positive overall performance: she was elevated from a temp to a full-time employee and later given a promotion and raise. (Cruz Decl., Dkt. 36-1, ¶ 3; Cruz Dep., Dkt. 35-1, at 52:9–53:1). Although Bonneau now declares that she wanted to fire Cruz before her injury, she did not document it and guesses that, at most, she mentioned it "in passing" to Lai. (Bonneau Dep., Dkt. 38-3, at 13:6–15:1). Contrary to Bonneau's contention that she worked with Cruz on improving her performance, Ravnsborg says that Bonneau "did not take the time to sufficiently train Cruz" and that Cruz was given "no defined productivity metrics" by which she might assess her performance. (Ravnsborg Decl., Dkt. 38-1, ¶¶ 4, 7). Cruz's performance was never serious enough to result in a customer complaint, and if she missed a shipping deadline, Bonneau cannot remember a time where that caused a problem. (Bonneau Dep., Dkt. 38-3, at 9:3–25).

From all of this evidence, Cruz points to inferences that can be drawn in her favor. If Cruz's pre-injury performance was really the issue, then why was she given a raise, never disciplined, and not sufficiently trained? (Cruz Resp., Dkt. 38, at 16–17). If her disability had nothing to do with her termination, why was she fired two months after returning to work full-time despite never being formally reprimanded in 18 months before her injury? (*Id.*). If her pace was such a problem, why did R2Sonic not take more serious measures to train her, and why is there no evidence that her pace caused problems with customers? (*Id.*). If a jury were to infer from the evidence that Cruz was not fired solely for her poor performance, it could reasonably conclude that she must have therefore been fired based in part on her disability. (*Id.*). Viewing the evidence in the light most favorable to Cruz, as it must at this stage, the Court agrees that the evidence supporting that inference suffices to establish a causal nexus between her disability and her termination.

<u>3. Is R2Sonic's Purported Neutral Justification Pretextual?</u>

Because Cruz has made a prima facie showing of an ADA violation, the *McDonnell Douglas* framework shifts the burden back to R2Sonic to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Williams*, 826 F.3d at 811. There is no dispute that R2Sonic has done so. As described in detail above, Lai and Bonneau both assert that Cruz was fired because she was unable to perform all of her job duties in a timely fashion, not because she was disabled. *See supra* at 17–18.

The burden now shifts back to Cruz "to produce evidence from which a jury could conclude that the employer's articulated reason is pretextual." *Williams*, 826 F.3d at 811. In an ADA case, as in other *McDonnell Douglas* contexts, a plaintiff may show pretext "by showing that the employer's proffered explanation is false or unworthy of credence." *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) (quoting *Jackson v. Cal–W. Packaging Corp.*, 602 F.3d 374, 378–79 (5th Cir. 2010)). "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Id.* (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). The same facts supporting Cruz's prima facie case for causal nexus, *supra* at 18–19, are, when viewed in the light most favorable to her, sufficient to create a genuine issue of material fact as to whether R2Sonic's explanation for firing her was pretextual. This case "does not present the sort of 'rare instance' where the plaintiff has only presented 'a weak issue of fact as to whether the employer's reason was untrue.'" *Caldwell*, 850 F.3d at 245 (quoting *Reeves*, 530 U.S. at 148). Nor is there "abundant and uncontroverted independent evidence that no discrimination ha[s] occurred." *Id.* (quoting *Reeves*, 530 U.S. at 148). R2Sonic is not entitled to summary judgment on Cruz's ADA and TCHRA discrimination claims.

## D. Retaliation

Cruz alleges that R2Sonic retaliated against her "for seeking accommodations and taking leave." (Orig. Pet., Dkt. 1-3, at 4). To establish a prima facie case of retaliation under the ADA, a

plaintiff must show that "(1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action." *Feist v. La., Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013). If a plaintiff establishes a prima facie case of retaliation, then the burden "shifts to the employer to state a legitimate, non-retaliatory reason for its decision." *Id.* If the employer does so, then the burden "shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation." *Id.* For ADA retaliation claims, the causal standard is stricter than it is for discrimination claims: the plaintiff must show "that the adverse action would not have occurred 'but for' the employer's retaliatory motive." *Id.* (citing *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999)).

The prima facie burden is not at issue; R2Sonic argues only that there is no evidence that her termination would not have happened "but for" her requests for accommodations and leave. (R2 Mot. Summ. J., Dkt 35, at 17). Even accounting for the higher standard, the evidence relevant to causation in Cruz's discrimination claim, *supra* at 17–19, is likewise sufficient to create a genuine issue of fact as to whether her requests for accommodation and leave were a but-for cause of her termination. R2Sonic is not entitled to summary judgment on Cruz's ADA and TCHRA retaliation claims.

### E.  Failure to Accommodate

In her final claim for relief, Cruz alleges that R2Sonic intentionally refused to accommodate her disability. (Orig. Pet., Dkt. 1-3, at 4). In a failure-to-accommodate claim under the ADA, a plaintiff must prove that: (1) she is a "qualified individual with a disability;" (2) the disability and its consequential limitations were "known" by the covered employer; and (3) the employer failed to make "reasonable accommodations" for such known limitations. *Feist*, 730 F.3d at 453.

Both R2Sonic and Cruz seek summary judgment in their favor on this claim. (R2 Mot. Summ. J., Dkt. 35, at 17–20; Cruz Mot. Summ. J., Dkt. 36, at 12–16). The Court has already decided that fact issues exist that preclude summary judgment in either party's favor on the issue of disability. *Supra* at 8–13. That alone is enough to deny summary judgment in Cruz's favor on this claim. All that remains, then, is whether R2Sonic is entitled to summary judgment. Because there is no dispute that Cruz's disability (if indeed it was a disability) was known to R2Sonic, the only question is whether Cruz has raised at least a genuine issue of material fact as to whether R2Sonic failed to make reasonable accommodations for her known limitations. *Feist*, 730 F.3d at 453.

The ADA defines "reasonable accommodations" to include "job restructuring," "part-time or modified work schedules," "acquisition or modification of equipment or devices," "training materials or policies," and "other similar accommodations" for individuals with disabilities. 42 U.S.C. § 12111(9)(B). Regulations implementing the ADA clarify that employers must make "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position[.]" 29 C.F.R. § 1630.2(o)(1)(ii). But the ADA "does not require an employer to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so." *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999). If a requested accommodation entails that the disabled employee not perform an essential job function, it is therefore not a reasonable accommodation. *Claiborne v. Recovery Sch. Dist.*, 690 F. App'x 249, 253 (5th Cir. 2017).

The ADA requires that a request for accommodation be "an interactive process . . . to ascertain what changes would allow [the employee] to continue working." *Dillard v. City of Austin, Tex.*, 837 F.3d 557, 562 (5th Cir. 2016) (citing *LHC Grp.*, 773 F.3d at 700). Employer and employee

must "work together in good faith, back and forth, to find a reasonable accommodation." *Id.* (citing *Chevron Phillips*, 570 F.3d at 621–22). The process should be "ongoing" and "reciprocal"; it should not end with "the first attempt at accommodation," but instead continue when the employee asks for a different accommodation or where the employer "is aware that the initial accommodation is failing and further accommodation is needed." *Id.* (citation and quotation marks omitted). The interactive process is not an "end in itself"—the question is whether an employer's unwillingness to engage in good faith leads to a failure to reasonably accommodate an employee. *Claiborne*, 690 F. App'x at 253. Only in such a situation does an employer violate the ADA by failing to engage in an interactive process regarding reasonable accommodations. *Id.*

R2Sonic's argument is that Cruz cannot "identify a reasonable accommodation request that was denied." (R2 Mot. Summ. J., Dkt. 35, at 18–19). Indeed, some of the accommodations identified by Cruz are not reasonable. According to her, tasks such as "receiving, testing cables, and answer phones" could have "easily be[en] reassigned," and she repeatedly asked Bonneau for help with these tasks while she recovered. (Cruz Decl., Dkt. 36-1, ¶ 14). But R2Sonic has argued without rebuttal that receiving, testing cables, and answering phone are essential functions of Cruz's job, (Bonneau Decl., Dkt. 35-3, ¶ 2), and the ADA does not require an employer to reassign other employees to perform essential functions of a plaintiff's job. *Burch*, 174 F.3d at 621.

According to R2Sonic, it engaged in a good-faith effort to obtain all of her doctor's notes and then granted all of the restrictions contained in those notes. (*Id.* at 19–20). This is, for the most part, undisputed. Cruz does not challenge R2Sonic's evidence that it excused her absence from work from January 24 until February 6, permitted her to work four hours a day from February 6 to February 13, gave her 15 minute breaks every hour or two after March 6, and never required her to lift more than her doctor cleared her to lift. (Lai Decl., Dkt. 35-2, ¶¶ 5–7). This undisputed evidence

does suggest that R2Sonic operated in good faith in many respects as Cruz worked her way back from injury.

But it is not enough that R2Sonic accommodated most of Cruz's medical restrictions.[8] The process of accommodating a disabled employee should be "ongoing" and continue when the employee asks for a different accommodation or where the employer "is aware that the initial accommodation is failing and further accommodation is needed." *Dillard*, 837 F.3d at 562 (citing *LHC Grp.*, 773 F.3d at 700). There is a fact issue as to whether R2Sonic engaged in good faith in an ongoing way and, if it failed to do so, whether that failure caused it to fail to reasonably accommodate Cruz. *See Claiborne*, 690 F. App'x at 253. Cruz avers that R2Sonic "never engaged in a process with me to discuss other potential accommodations" for her impairments. (Cruz Decl., Dkt. 36-1, ¶ 19). Ravnsborg corroborates Cruz's position: although she agrees that Cruz was given help with the "physical demands of the job," she is "not aware of anyone looking into helping or getting [Cruz] additional help for the mental demands of the job." (Ravnsborg Decl., Dkt. 38-1, ¶ 8). To her knowledge, Bonneau—whom she supervised—"did not undertake a process to find support for the mental demands of Cruz's job following the injury." (*Id.*). Bonneau admits that she did not consider giving Cruz time-management tools or coaching Cruz to help her work quicker. (Bonneau Dep., Dkt. 38-3, at 33:16–34:14). Training materials are one form of reasonable accommodation. 42 U.S.C. § 12111(9)(B). Another is new materials or devices. *Id.* After Cruz was fired, R2Sonic implemented a "new system" that made its business more efficient, including Cruz's job functions. (Ravnsborg Decl., Dkt. 38-1, ¶ 10). According to Cruz, R2Sonic considered none of these accommodations even as it became clear that she needed more help to complete her work quicker. (Cruz Decl., Dkt. 36-1, ¶ 19).

---

[8] Cruz argues that R2Sonic's failure to help her get her work done more quickly effectively forced her to work overtime in violation of her doctor's notes, (Cruz Decl., Dkt. 36-1, ¶ 18), notwithstanding Bonneau's purported insistence that Cruz not work overtime, (Bonneau Decl., Dkt. 35-3, ¶ 17).

Certainly, there is conflicting evidence on this point. It is undisputed that R2Sonic accommodated the series of doctor's notes that kept her out of work completely for a week, then limited her to part-time for another week, and then required that she be given regular 15-minute breaks. (Lai Decl., Dkt. 35-2, ¶¶ 5–6). There is evidence that R2Sonic took an active role in obtaining Cruz's doctor's notes and continued to insist that she follow them. (*Id.* ¶ 7). And although a jury might ultimately conclude that R2Sonic engaged with Cruz in good faith about potential accommodations throughout the process, the Court cannot make credibility determinations or weigh the evidence at this stage. *Reeves*, 530 U.S. at 150. R2Sonic is not entitled to summary judgment on Cruz's ADA and TCHRA failure-to-accommodate claims.

### F. R2Sonic's Affirmative Defenses

Cruz seeks summary judgment on all eighteen of R2Sonic's affirmative defenses. It is warranted for almost none of them. Many of them need not be addressed, as they are not affirmative defenses at all but simply negations of elements that Cruz must prove. (Cruz Mot. Summ. J., Dkt. 36, at 18–20 (Defenses No. 11–15, 17)). Summary judgment is denied for others because there is evidence that raises a genuine issue of material fact. (*Id.* at 17–19 (Defenses No. 2, 3, 5, 6, 8, 16)). For still others it is denied because, despite Plaintiff's contention, they describe defenses that may properly be raised at trial and, depending on the evidence at trial, may yet succeed. (*Id.* at 17–20 (Defenses No. 1, 7, 18)). Cruz concedes that a certain defense might apply but asks that it be limited; she may raise that argument at trial. (*Id.* at 17 (Defense No. 4)). That leaves only Defenses No. 9 and 10, which pertain to damages and attorney's fees. (*Id.* at 18). Defense 9, which pertains to the constitutionality of punitive damages, is properly reserved for trial, as the issue turns in part on the ratio between a punitive- and compensatory-damages award. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425–26 (2003).

The only defense on which summary judgment is appropriate is Defense No. 10, which seeks attorney's fees and costs because Cruz's lawsuit is "frivolous, unreasonable, and groundless." (Am. Answer, Dkt. 34, at 6). The ADA authorizes courts to award attorney's fees to a prevailing party, 42 U.S.C. § 12205, but fee-shifting under the ADA is guided by the same considerations as in actions brought under Title VII of the Civil Rights Act of 1964 or 42 U.S.C. § 1988. *No Barriers, Inc. v. Brinker Chili's Texas, Inc.*, 262 F.3d 496, 498 (5th Cir. 2001). Under that standard, a prevailing defendant may not receive fees "unless a court finds that [the plaintiff's] claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Id.* (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978)). As illustrated by the many genuine issues of material fact that pervade this case after discovery and at the doorstep of trial, Cruz's action, even if it ultimately proves unsuccessful, is plainly not frivolous, unreasonable, or groundless.

## IV. CONCLUSION

For these reasons, the Court **ORDERS** as follows. **IT IS ORDERED** that R2Sonic's motion to strike, (Dkt. 40), is **GRANTED IN PART**. That motion is granted only insofar as the Court strikes Paragraphs 4 and 22. The motion is otherwise denied. **IT IS FURTHER ORDERED** that R2Sonic's motion for summary judgment, (Dkt. 35), is **DENIED**. **IT IS FINALLY ORDERED** that Cruz's motion for partial summary judgment, (Dkt. 36), is **GRANTED IN PART**. That motion is granted only insofar as Cruz is awarded summary judgment on R2Sonic's affirmative defense No. 10. The motion is otherwise denied.

**SIGNED** on September 26, 2019.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE